Dwoskin v. Bank of America. Mr. White. May it please the Court. We ask the Court to vacate and remand for three reasons. First, summary judgment was improper here because Bank of America did violate the HBA. It intended to place mortgage insurance on each loan it issued. It did not give borrowers a choice as to whether or not to accept mortgage insurance and deliberately avoided the disclosure requirements of the HBA. Second, summary judgment is improper because there was a genuine issue of material fact and to the extent there was not, two Rule 56D affidavits were submitted that demonstrated particular documents and depositions. Third, summary judgment was improper as to state law claims because we pointed to a genuine issue of material fact on damages. As to the first issue, the HBA, mortgage insurance was required. The problem is that what you always want to do is to eliminate the clause, in connection with, and that's the only way your argument holds up. But that's in the statute. Well, yes, Your Honor, but in connection with is not, as the O'Connor case shows, in connection with does not mean mortgage insurance that is placed at closing. Mortgage insurance could be placed during the course of the transaction. In connection with is the transaction. Under your theory, what does in connection with add to the statute? In connection with adds that this is mortgage insurance that is connected to this loan transaction. The disclosures extend far beyond closing. There are disclosures with LPMI that need to be made when the loan hits 80%. Those loans are in connection with the transaction. The transaction is the entire mortgage transaction. But wouldn't it be possible to see the words in connection with as narrowing the timing of the disclosure rather than broadening it? Well, Your Honor, in connection with means in connection with this mortgage. Certainly mortgage insurance has gotten in connection with another mortgage. Mortgage insurance has gotten. Where does that get you? I mean, it seems where you're talking about in connection with a residential mortgage transaction. When you talk about a transaction, I was just reading it without the help of any legislative history or anything. But the words that came, the thought that came to my mind, oh, what is a residential mortgage transaction? And the instinctive thought I had was, oh, well, that means the closing or sometime before. Well, the important thing. That's a transaction. I mean, the transaction is when they sit down and sign those documents, sign the papers, all the different papers and everything that go with closing a mortgage loan. That is the transaction, isn't it? Well, yeah, but, Your Honor, in this case, there was intent at the time of closing. I mean, the bank, there's testimony from the bank, from Peter Dent, who was the 30B6 opponent, that the bank intended to place mortgage insurance on every loan. Which it was going to buy and not charge its clients. So I don't know how that that mortgage insurance was required in connection with the residential mortgage. Well, Your Honor, first of all. That's what the statute says. Sure. Well, first of all, the disclosure says, the disclosure itself says that there is usually a cost passed on to the buyer. That's one of the disclosures. It's not a requirement of the statute that cost be passed on to the borrower. And it is undisputed that the cost here was not. It is not undisputed, Your Honor. That's precisely the point. Well, you don't have any evidence. Well, no, Your Honor, we do have evidence. The problem is we have, and I don't want to lose the point, and I will address that. Do this in the order in which you would like. Certainly, Your Honor. An important piece of testimony, not a piece of testimony, a piece of evidence, is the letter from Gina Turpin, who was the person who created the program. There's an email that Ms. Turpin had which said that when the bank purchases what they're calling a post-closing credit enhancement on the back end, this is joint appendix at 1784, it was determined there were no front-end implications because we didn't have the intent at the time the loan was originated. The bank determined that by placing this. They knew full well they were going to put mortgage insurance on these loans. But the thought was if we just simply wait, we don't have to disclose it. The mortgage insurance was required in connection with this transaction. They knew they were going to put mortgage insurance on this. It was not required. It was obtained. But it wasn't required because the transaction, as Judge Wilkinson told you, there was the closing. It wasn't required. But it was required. If Mr. Dwoskin had asked to get this loan without mortgage insurance, he would have been told no. It was required. It was not optional. You know, if a bank had said, okay, we're going to close on the loan, and then they had it in their minds that one week later they were going to take out lender-provided mortgage insurance, and that that was going to have an impact on the interest rates, then I think you might have a different case here. But I don't know that I could get from that one little snippet of an email, particularly when it's taken in the context of a much larger discussion, that this is one of those things where in order to circumvent the statute, the bank had some sort of secret or clandestine intent to take out lender-provided mortgage insurance a week later. It seemed to me a perfectly natural flow of events, that they didn't know whether the particular mortgage was going to be eligible for lender-provided mortgage insurance, and that they intended to keep, as to the intent, they intended to keep these loans on the books. And then when the 2008 recession came along, and all the financial adversity that hit banks as a result of that turn of events, and as a result of the recession, the bank faced, as most banks did, the bank faced a liquidity crisis. And so rather than keeping the loans on the books, it was going to sell the loans to Fannie Mae and Freddie Mac. And it was, as I understand, it was Fannie Mae and Freddie Mac that required lender-provided mortgage insurance before they would be the loan. I don't know that this was a case of malign intent. I think when you look at the whole context of the email, it doesn't bear out that little snippet that you're pointing to. But they faced a liquidity crisis, and they had to provide lender-provided mortgage insurance before Fannie Mae and Freddie Mac would accept those loans. And, Your Honor, you're right. But I think that the important thing – and this is certainly the way the bank would like to portray it. They would like to portray things precisely the way you've let them out. Yeah, but that's not – the 2008 recession and those things, they did hit. Yeah, the bank didn't create that. No, no, no, Your Honor. We're not saying they did, but the point is that the bank – it was not the scenario that you set out, Judge Wilkinson. It was not a case of the bank having issued all of these no-fee mortgage-plus loans with full intent to keep them on the books, and they were going to put them on their own balance sheet. Then suddenly a liquidity crisis hit, and they sold the loans. That would be a very different case than what we have here. What we have here is the bank made the decision in June of 2007 that this product didn't work financially. They had to sell these loans to GSEs, and they knew it before they issued any of the loans of any of the plaintiffs. They knew full well that they had to sell the loans. Peter Dent testified that every loan that qualified was sold. They knew full well the qualifications that Fannie and Freddie had for loans. They knew in advance. In fact, there was testimony about something called a virtual warehouse. They pegged the loans before they were issued as a loan that could potentially be sold to a GSE. They knew that they could disclose it. I think the important thing here, Your Honor, is what the disclosures are. I mean, the disclosures that are made are not specific. They're generic. Were these variable-rate mortgages, or were they fixed-rate? Your Honor, I believe they were variable-rate mortgages. No, not what you believe. No, okay. I don't know, Your Honor, what the reason was. Would that make a difference? No, Your Honor, I don't think it would. I mean, it was a— The clandestine theory that you're sketching out, wouldn't that have a greater—wouldn't you want them to be variable-rate? Well, no, Your Honor, because the issue here is—I mean, it's two issues. The first issue, and the issue on summary judgment, is was this required? The issue of interest rates or whether there was an increase in interest rates or whether this cost more is not an issue. Well, did anybody actually get their interest rate increased? You mean in an adjustable-rate mortgage, Your Honor? Any of the plaintiffs ever have their interest rate increased under their mortgage? I don't know, Your Honor. In other words, no. Yeah, I think you would know. Yeah. Well, but, I mean, you mean increased as— No, I mean, what I'm asking, are we dealing with a real problem here or are we shadowboxing? Because the whole idea of the disclosure is, with respect to lender-provided mortgage insurance, is to alert plaintiffs to the idea that down the road the interest rate might increase. And the clandestine theory that you are proposing would seem to have as a crucial element of it that, ha, ha, ha, we got these folks, we're going to provide a lender—you know, we're going to do the lender and provide it. And as a result, we're going to increase the interest rates. And I want to know whether anybody's interest rates by this mean old bank were increased. Were they? That's not the harm you're alleging. No, Your Honor. The only harm that you're alleging is that when your clients later wanted to refinance, they found out about these lender-based— But some of them said they got a better deal with this bank than they would possibly have gotten any other way. Is that not right, some of your clients? Some of my clients did, Your Honor. But that goes to the issue— But you don't allege, in response to Judge Wilkinson's question, you're not alleging that these people had their rates changed and the bank then said, Oh, no, you're having it changed because we have this insurance, this lender-based— No, Your Honor. What we're alleging is that the— You could have a more compelling case if you argue that. You certainly would. But you don't have the governance to argue that. Well, no, but we are arguing that the interest rate—the bank admits their interest rate was higher. I mean, this was a better deal because nobody else would offer no mortgage insurance. I mean, anyone else who's doing a 95 percent loan, they're going to require fireplace mortgage insurance. I don't know what you mean about their interest rate was higher. Their interest rate was maybe higher than somebody that was going to pay a down payment of 90 percent of the loan, yes. But it's not higher for the people that were getting loans like this. Well, but, Your Honor, I think that's the point, is that the competing loans were loans that were very differently structured. And people at the bank who were getting loans at this level, at the 90-95 percent level, were only getting this product. It's higher than what? We don't know what the baseline is. The important thing about higher is that we found an opponent, the bank's opponent on interest rate, who said that the banks essentially set these interest rates in a black box. So in order—but the interest rate issue is in some ways— And they had to give up the plan because it was too—it wasn't profitable. In the end, it wasn't profitable. But we don't know how they set the rates. We still don't know how they set the rates. We don't know what the inputs were to the rates. Well, I come back. We can talk about the interest rate increase. To me, it makes a tangible difference. But you still come back to the statutory language in Section 4905 required in connection with a residential mortgage transaction. And that seems to me to speak to the timing of these disclosures. That seems to me to be the relevance of it. And the word required, which seems to me the most natural reading of the word required, is that the bank insists on that this is—required means it's a condition of a residential mortgage transaction. And the word transaction means closing. But, Your Honor, it is a condition of the loan. It is—you cannot get a no-fee mortgage plus loan at this time when they're being sold to Fannie and Freddie without mortgage insurance. That's required. It's not optional. If the bank chose to buy it later or to not put it on a closing sheet, which they wouldn't do anyway, the only disclosure they would have with LPMI would be the HPA disclosures. That's the only way these borrowers would know. And, Your Honor, that's the point. They didn't know. The bank chose not to tell them when they knew full well they were going to put this on. And that's why it's not shadowboxing. It's a disclosure that is required under the statute. And it's a strict liability statute, Your Honor. There's statutory damages. You don't have to show damages. But you say it's a disclosure that's required, but you overlook the question of when. Your Honor, with the loan that is issued. And the bank, by choosing to place this in rolling purchases after closing, doesn't avoid the disclosure requirements. They have to be disclosed because the bank knew. Well, I just worry about expanding the statute because I think it's sometimes very difficult to know whether at some future point in time this kind of lender provided mortgage insurance is going to be taken out or not. And that's right, Your Honor. And if they don't know, they don't have to disclose. But when they do know, as they did here, they do need to disclose. All right, thank you. Thank you, Your Honor. Good morning, and may it please the Court. I'm Brad Cutrow, representing Bank of America. The district court's summary judgment orders should be affirmed. After years of litigation, the district judge correctly held there was no violation of the Homeowner's Protection Act here, and the evidence demonstrated there was no injury to the plaintiff borrowers. She heard all the arguments the plaintiffs are making here today and rejected them at summary judgment and then reheard them on two separate motions for reconsideration and rejected them again. She reaffirmed her determination that the plaintiffs had ample opportunity for discovery and that the plaintiffs had failed to demonstrate the diligence required to warrant reconsideration of her summary judgment ruling. She held that the plaintiff borrowers had suffered no harm and certainly no harm that the HPA was enacted to prevent. There is no basis for this Court to set aside the district court's considered rulings on any of the grounds presented by my colleague, Mr. White. I'll begin with the court's first topic of consideration, which was the HPA. The district court correctly ruled that mortgage insurance was not required on the NFP loans because the lender did not condition issuance of the loan on obtaining whether or not the mortgage insurance would be obtained later on. And I think that's important. All of these loans went through the same credit and underwriting process, irrespective of whether that loan eventually got insurance or eventually didn't get insurance. And as Judge Blake pointed out, in her summary judgment ruling, certainly if there was an NFMP loan that didn't get insurance, it wasn't rescinded. All of these loans, the loan interest rate for these plaintiff's loans, the interest rate, the other loan terms, none of that changed at any time. And there was no requirement imposed by the bank, which is the prospective mortgage. Was there a fixed interest rate on these loans? And that's an important question, Judge Mott. These particular plaintiffs, 13 loans, 20 plaintiffs, are all 30-year fixed mortgages, conventional 30-year fixed. And they all testified in their depositions that their loan terms never changed throughout the life of the loan. Now, there were other NFMP loans that had variable interest rates of the typical kind. None of those folks are plaintiffs here. Only this set of plaintiffs of our 13 plaintiffs. The plaintiffs here had fixed rates. Correct, Your Honor. And the interest rate never changed the life of the loan. None of the loan terms changed the life of the loan. So if we take these words of the statute and try to broaden them and twist them and we say, well, no, it doesn't necessarily mean at the time of closing, then when does it mean the disclosures must be required? I mean, it leaves everything in a bit of a sea of indeterminacy. When do they? Yes, Your Honor. And, in fact, the disclosure must be made at the time. It's even up before the point of closing because it's at the time of the loan commitment, meaning when the lender says, yes, we've committed to issue you this loan, which is before closing. But I think you're exactly right. The operative powers. I'm sorry. The statute says that? Yeah. 4905? The initial disclosure must be made at the time of the loan commitment, Your Honor. I suppose the statute could have been written differently and just say that the disclosures must be required at any time that lender-provided mortgage insurance is obtained. It could have been written that way. It could have been, but it wasn't, Your Honor. But it wasn't. Those seem to me probably the two alternatives because you don't want to just leave the time up in the air. So your Congress is facing one alternative, which is at the time of closing, and then it's facing another alternative whenever the insurance is taken out. And the language seems to me to point rather clearly to the one alternative. Well, that's correct, Your Honor. That's important because the HPA was really designed to address the situation where the placement of mortgage insurance was going to have some impact on the borrower that the borrower needed to know about at the time of closing. Here, the evidence is unequivocal that the later placement, the subsequent placement of mortgage insurance on these loans as a post-closing credit enhancement had absolutely no impact on the borrowers. And I should say, not to go too far afield, but this kind of mortgage insurance is commonly used on pools of loans that may be owned by the lender or they may be owned by other investors because economic conditions change, the housing prices go down. Because they did here, apparently. And they certainly did here, Your Honor. So this is a frequently used type of mortgage insurance on pools of loans that's important in the secondary market. And so to expand the statute to somehow say when a loan down the road, you know, weeks or months or years after closing gets mortgage insurance, that there's some requirement for an HPA-based disclosure, doesn't make any sense given the statute. And, you know, what can they do about it? At that point, suppose down the road you take out lender-provided mortgage insurance. Well, what, I mean, what can you do? If it's a variable-rate mortgage, then the rate is variable and it will change as financial conditions change. But, you know, if you require the disclosure at the time of closing, then the borrower has an option, which is going to say, well, wait a minute, this isn't something I want to get into. But if you require the disclosure later on down the road, what option does the buyer have? The contract has been signed. And the contract here, as is typical, the loan terms for all these borrowers were set at the time of the closing and they never changed, Your Honor. That's why it's important, we think, to look at the statute in terms of the impact. And here it's clear that the subsequent placement of mortgage insurance on these borrowers' loans had no impact on them. They found out about it only after the only reason that they perceived it to be making a difference was after the HARP program was created, which was after all of these loans were closed and funded. Months later, the last of these loans, it's important for the court to recall, as I mentioned, there are 13 different loans over a span of about a year and a half. The first two loans were actually closed in June and early July of 2007, which was months before any mortgage insurance was ever purchased for any NFMP loan. So those folks, I've never understood how they would have a claim. But the last one to close was in December of 2008. That was the Dwoskins loan. And you may remember the language that was quoted in Judge Blake's decision where the Dwoskins were the folks who had an independent mortgage broker say, the Bank of America deal is a good deal. You should take it. They were the last of the borrowers to close their loan in December 2008. HARP was created in the spring of 2009. It became operative in April of 2009. And it is true that once HARP was created, these borrowers, first of all, they didn't understand that they would never have been eligible for HARP unless Fannie and Freddie owned their loans, which was why the mortgage insurance was necessary. But it was a function of the HARP program, not anything that the bank had done that was temporarily problematic in terms of their refinancing. Then when the HARP II guidelines changed and it became easier to refinance, all of these borrowers were able to refinance under HARP II or those that hadn't already refinanced conventionally. So your strongest argument has to be, I think, the language of the statute itself. Well, that's where... Those two words, or three really, required in connection with and transaction. That's correct, Your Honor. And all of those three words or phrases point toward the time of closing. That is exactly right, Your Honor. And that's the statute. And that, I think, that was why, Your Honor, we felt strongly that we had a very solid and comprehensive evidentiary record upon which to move for summary judgment, and that's why we requested, and Judge Blake, ultimately, after having managed the discovery... I'll say the district judge here was awfully patient. This discovery here was just voluminous. Well, Your Honor, it was certainly methodical, and I would agree it wound up ultimately being voluminous. And if I could recap that for you briefly. We'd actually done some informal discovery in 2012 when we did an informal early mediation. And then formal discovery really began in 2013. The district judge entered a scheduling order in March. We did very detailed interrogatory responses that laid out really the metrics and the data about the NFMP loan program and laid out the critical facts of how the program worked that ultimately became the basis for summary judgment. We did that in April 2013. I guess with electronic discovery, you do generate a lot of documents. But even in the age of electronic discovery, 88,000 documents strikes me as more than a pittance. And the point was additionally made that the plaintiffs here were tardy in identifying the people they wanted to depose, and it wasn't mentioned until late in the day when the summary judgment motion was passed. And that's where I was going to continue with the narrative, Your Honor. We methodically deposed all of the parties in the case, the plaintiffs first. And we got their testimony where they said, yes, these were the best loans we could find. These were really good terms and interest rates. And that testimony was uniform across the borrowers. We also by then had been able to show that their misunderstanding about the HARP program and the refinancing was just a misunderstanding. They didn't understand why the HARP refinance had been difficult. And so the two key premises of the whole complaint, which was this notion that the interest rates had been increased, was incorrect. The notion of the difficulties with refinancing being the fault of the bank rather than the fault of the HARP program, for which insurance was a predicate and ownership by Fannie and Freddie was a predicate. So we were able to establish that, and then we went into our 30B6 depositions. After we completed the plaintiff party depositions, which was at the end of 2013, the plaintiffs served a very comprehensive 30B6 deposition notice, 24 topics, and we designated four separate designees to testify. Who were the people who were responsible for the key aspects of the NFMP program? To be the witnesses. The head of pricing for mortgages, including the NFMP mortgage. That was Dan Maloof. The senior vice president for product development and product strategy, who was Pat Mooney. She had been the person who had led the development of the product. Peter Dent, who was the person who was responsible for acquiring mortgage insurance. Again, this closing insurance. And they were the folks with the comprehensive knowledge, Your Honor, about the program. And we completed their depositions in April and May of 2014, and there were no complaints about the adequacy of their testimony, about whether or not they had been able to meet the topics that they were designated for under 30B6. And that, as far as we were hearing from the plaintiffs, completed the deposition testimony. There was never any follow-up request for any specific individual at any point after that. I appreciate that, counsel, and that's set forth in your brief. At this point, I'm going to ask my co-panelists if they have any further questions. If not, then we don't. Thank you, Your Honor. I appreciate your argument. You have some rebuttal time, sir. Thank you, Your Honor. First, very briefly, I think it's important to keep in mind that this is not a case of Bank of America simply deciding to place loans into this post-credit environment. These are loans where the borrowers were affirmatively told the loan was sold on the premise of no mortgage insurance. So the disclosure requirement becomes important when the borrowers not only didn't receive a disclosure, but they were told that there was an affirmative representation that there was no LPMI. Do you have evidence that you pointed to in front of the district judge or that you can point to in front of us that there was mortgage insurance purchased when the loans were made? Well, Your Honor, your question, was the mortgage insurance purchased when the loans were made? Yes. Well, the evidence we have, Your Honor, is that the loans were pegged. They were put into this virtual warehouse. Were they purchased? Were they applied to these loans that were made at the time the loan was made? Yes. At the time it was made? Yes. That's your representation? Yes, Your Honor. Okay. Tell me the record evidence of that. That is in the Peter Dent. This isn't years or months or days after the loan was closed, but at the time the loan was closed, there had been insurance purchased with respect to those loans? It was not insurance purchased, Your Honor. Loans had been identified. How many times? No, no. I understand your question. What was the question that you thought you were answering if it wasn't that? It was were the loans identified? Yes. No. Was the mortgage purchased? Okay. No, Your Honor. Obviously the entire point of this is that insurance was purchased later. But the point was that there was intent. I think in terms of the discovery process, just the 56D motion. Where does the statute talk about intent? The statute talks about required. Required in connection with? And intent. The Augustine Court talks about how the required is not optional. Required means exactly as here. Nobody could have gotten a Mophie mortgage loan and said, but please do not, as you represented, give me mortgage insurance. You couldn't have done that. Putting this intent thing in, there may be egregious cases, but as a general matter, to put in the word intent completely transforms the statute. It just opens it up. It just way opens up the grounds of discovery, which is what we have seen here with these years of discovery and these 88,000 documents and the rest. And it means that every time we get a case where there hasn't been any purchase, Linda provided mortgage insurance at the time of closing, it's going to become an intent case. Every time. It will. Every one of these cases will. And it will be broadening and mushrooming into some huge kind of massive litigation when that, it seems to me, was what the statute intended to foreclose. We would be amending from the bench. The situation the bank is engaged in here is a particularly egregious one. Your Honor, I just want to address briefly this issue that we were tardy in discovery. I understand the scope. The scope, it was an electronic search on search terms. But what happened seven times during the course of the case, there were 11 status conferences, and seven of them, plaintiffs said that they need to do individual discovery. After the Dan Mooney deposition, the interest rate deposition, we raised with the court, less than a month later, a request that we be allowed to seek limited documents from the bank. Because the court had ordered no discovery. So we asked the court, can we address with the bank limited deficiencies in discovery? The same thing that the expert Panepinto raised in the 56D. And we also pointed to 4,000 privileged emails regarding this issue of concealment. We wanted to be able to address that. Judge Blake ordered briefing on summary judgment first before discovery would be proceeding. So the point is we did actually attempt to raise this issue with the bank. We weren't dilatory. As soon as we knew that this interest rate was an issue, we raised it with the judge who told us wait for summary judgment. And then we raised our 56D affidavit stating we had needed that information in order to respond properly. Also, in terms of summary judgment, this is a question of genuine issue of fact. We believe there is a genuine issue of fact here, Your Honor, on this required issue. It is not a matter of law. The intent of Congress to cut down on these issues of tribal fact when it said, when it identified the moment of the transaction of closing at the time, as the time when the lender provided mortgage insurance was taken out. They wanted the borrower to know that particular fact at that particular time. And this, you know, we're not going to blow up these cases into this massive endless discovery litigation with an intense standard when it seems to me that the precise language that the Congress used was to head this kind of thing off at the pass. And this is transforming the statute. It is rewriting the statute. That's what it is doing. Respectfully, Your Honor, I disagree. The statute, and I do direct you to take a look at 4905, and the fact that there are two disclosures with LPMI. There's the disclosure that's made before closing, and then there's the disclosure made when the loan hits 80%. The transaction is far more than closing. All right. Well, I think we have your briefs, and we appreciate both the briefs and your argument. And we'll take a brief, we'll come down and shake hands with you, and then we'll take a very brief recess.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Robert B. King